**WO**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Dessie Mitcheson, et al.,

    Plaintiffs,

v.

El Antro LLC,

    Defendant.

No. CV-19-01598-PHX-GMS

**ORDER**

Before the Court are Plaintiffs Dessie Mitcheson, Jessica Killings, Claudia Sampedro, Lina Posada, Jesse Golden, Rosie Jones and CJ Gibson ("Plaintiffs")' and Defendant El Antro LLC's ("Defendant") motions to strike seeking to exclude certain experts, (Motion to Strike the Expert Report and Testimony of Michael Einhorn Doc. 31; Motion to Strike Report and Testimony of Stephen Chamberlin Doc. 42; Motion to Strike Report and Testimony of Martin Buncher Doc. 43), and Cross Motions for Summary Judgment (Docs. 32, 34).[1]

### BACKGROUND

Defendant operates a nightclub in Phoenix, Arizona. Plaintiffs are seven professional models, actresses, and social media personalities who have appeared in

---

[1] The parties' requests for oral argument are denied because the parties have had an adequate opportunity to discuss the law and evidence and oral argument will not aid the Court's decision. *See Lake at Las Vegas Invrs. Grp., Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

magazines such as *Maxim*, *Playboy*, *American Curves*, *Nuts*, and *Wired*. (Doc. 1 at 3–5.) They have modeled for brands such as Crest Toothpaste, Wonder Bra, and Monster Energy Drink, and have social media followings ranging from approximately 60,000 followers to over 2,000,000. *Id.* Plaintiffs allege that Defendant unlawfully posted or displayed their images and likeness fourteen times on its Facebook and Instagram pages to promote its Club. *Id.* at 8–9. Each of these images was from past photoshoots of the Plaintiffs.

Plaintiffs allege that Defendant's advertisements created the false impression that they were affiliated with, worked for, or endorsed Defendant's Club. Plaintiffs brought suit, claiming misappropriation of likeness and false light invasion of privacy under Arizona law, and false advertising and false association under the Lanham Act. Both sides now move for summary judgment on all claims.

The parties have also retained respective experts. Plaintiffs retained Martin Buncher to conduct a survey to measure the likelihood of consumer confusion resulting from Defendant's use of Plaintiffs' photographs. Defendants retained Michael Einhorn and Plaintiffs retained Stephen Chamberlin to testify as to damages. Both parties have moved to strike one another's experts.

## DISCUSSION

**I.    Motions to Strike**

**A. Legal Standard**

The Federal Rules of Evidence require this Court to decide preliminary questions about the qualification or admissibility of witness testimony. Fed. R. Evid. 104(a). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Further, a court must "ensure that any and all scientific testimony or

1    evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*,
2    509 U.S. 579, 589, 113 (1993). Testimony is "relevant if the knowledge underlying it has
3    a valid connection to the pertinent inquiry," and reliable if "it has a reliable basis in the
4    knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558,
5    565 (9th Cir. 2010). Ultimately, a court must ensure that "expert testimony, whether it is
6    based on 'professional studies or personal experience, employs in the courtroom the same
7    level of intellectual rigor that characterizes the practice of an expert in the relevant field.'"
8    *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025,
9    1035-36 (9th Cir. 2010) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152
10   (1997)). "Rule 702 is applied consistent with 'the liberal thrust of the Federal Rules and
11   their general approach of relaxing the traditional barriers to opinion testimony.'" *Jinro Am.*
12   *Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 1004 (9th Cir.) (quoting *Daubert*, 509 U.S. at 588).

### B. Analysis

#### 1. Dr. Michael Einhorn

##### a. Qualifications

16   Rule 702 "contemplates a broad conception of expert qualifications." *Hangarter v.*
17   *Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1015 (9th Cir. 2004). Because the standard
18   is "intended to embrace more than a narrow definition of qualified expert," expert
19   witnesses need only a "minimal foundation of knowledge, skill, and experience." *Id.*;
20   *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994).

21   Dr. Einhorn has a Ph. D in microeconomics and has consulted on market valuations
22   in intellectual property, entertainment, and technology matters since 2001. (Doc. 38-3 at
23   4.) These matters include providing expertise in lawsuits "involving over 135 models who
24   have alleged right of publicity claims for unlawful use of their image." *Id.* He has also
25   authored and published several articles in the areas of media, technology, and intellectual
26   property. (Doc. 38-2 at 92.) He is therefore qualified to provide an opinion on valuations
27   in this case. Plaintiffs' assertions that Dr. Einhorn lacks requisite experience in the
28   modeling industry are undermined by his experience as an expert in the entertainment

1    industry. Regardless, economists and evaluation experts may be permitted to testify in

2    cases where they lack experience in the narrower industry at issue when they have relevant

3    experience in valuation. *See, e.g.*, *People v. Kinder Morgan Energy Partners*, 159 F. Supp.

4    3d 1182, 1190 (S.D. Cal. 2016) (declining to find and expert was unqualified because he

5    lacked experience in the field at issue because he had "provided market analyses in a wide

6    variety of industries."); *Abu-Lughod v. Calis*, No. CV132792DMGGJSX, 2015 WL

7    12731921, at *2 (C.D. Cal. July 1, 2015) (finding expert's experience as an economist and

8    analyst in several other fields sufficient to establish that he was qualified to give an opinion

9    about the video game industry, even though he had not done so before). Dr. Einhorn is

10   therefore qualified to offer an opinion on the value of Plaintiffs' services.

                              **b.  Reliability**

12       "The trial judge in all cases of proffered expert testimony must find that it is properly

13   grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702

14   Committee Notes on Rules 2000 Amendments. "The expert's testimony must be grounded

15   in an accepted body of learning or experience in the expert's field, and the expert must

16   explain how the conclusion is so grounded." *Id.*

17       Dr. Einhorn's testimony appears to be sufficiently grounded and well-reasoned to

18   be admitted. He explains several sources of information which form the basis of his

19   opinion—the contracts Plaintiffs' produced in discovery, 19 modeling contracts that he has

20   examined in other cases, a search of "working day rates" of models to identify several

21   websites of companies that hire and pay lingerie models. Although Plaintiffs characterize

22   this process as simply "googling," considering sources such as the modeling contracts he

23   has worked with in the past and the rates that similar employers currently offer is not a

24   facially ungrounded technique. Dr. Einhorn's report thus adequately explains the bases

25   underlying his opinion. In combination with his above experience in valuation, these

26   evaluations are sufficiently reliable. *See Yeager v. AT&T Mobility*, LLC, No.

27   CIVS072517KJMGGH, 2012 WL 13041995, at *4 (E.D. Cal. May 30, 2012) (finding

28   expert sufficiently reliable where he estimated the value of celebrity endorsements by

referring "mentally to thousands of documents" and contracts with which he had been involved).

Plaintiffs' core objections concern the weight of Dr. Einhorn's testimony rather than reliability. "Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1231 (9th Cir. 1998) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)). For example, Plaintiffs challenge Dr. Einhorn's use of a "final" rate, rather than a pre-negotiated rate unrelated to the number of images a model produces. (Doc. 31 at 13.) But his use of these values in the estimation is a matter of methodology. As Dr. Einhorn's report represents that it is based upon several modeling contracts and other research on rates in the industry, whether these rates most accurately reflect the facts at hand will be an issue of fact which can be addressed at trial through cross examination. Similarly, Plaintiffs' objection to Dr. Einhorn's use of undisclosed contracts from other cases does not establish unreliability. *See Vaughn v. City of Los Angeles*, No. CV1603086ABAJWX, 2017 WL 8786868, at *3 (C.D. Cal. Oct. 30, 2017) (finding expert reliable and specifying that objections that the expert relied on undisclosed facts and based opinion on only limited documents "go to weight, not admissibility").[2] Thus, although Plaintiffs' claim that estimates formed with data from contracts other than the Plaintiffs' cannot account for the unique value and experience of each model, these questions do not negate that Dr. Einhorn's methodology is sufficiently explained and can go to the evidence's weight.

### c.  Helpful to the Trier of Fact

Expert testimony must be helpful to the trier of fact to be properly admitted. This "requirement relates primarily to relevance. It requires the district court to make a preliminary determination as to whether the scientific knowledge can be applied to facts of

---

[2] Plaintiffs also concede that they have not deposed Dr. Einhorn and do not allege that they have ever requested that he produce these contracts, instead reasoning that because they deposed him in an earlier, similar case, "there was no need to depose him again on this action." (Doc. 39 at 6.)

the case at hand." *United States v. Rincon*, 28 F.3d 921, 925 (9th Cir. 1994) (internal citation omitted). "For an expert's testimony to help the trier of fact understand the evidence, 'the subject matter at issue must be beyond the common knowledge of the average layman.'" *Mata v. Or. Health Auth.*, 739 F. App'x 370, 372 (9th Cir. 2018) (quoting *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002)).

Dr. Einhorn's testimony is helpful to the trier of fact because his valuations shed light on the potential value of the services Plaintiffs' claim were wrongly appropriated. Valuations of their modeling contracts, therefore, go directly to the potential damages they are entitled to in the case at hand. Plaintiffs' objections to Dr. Einhorn's testimony amount to disagreements with his methodology and results. As discussed above, these qualms do not disqualify an expert from testifying, but instead go to the weight the testimony should be afforded. *Kennedy*, 161 F.3d at 1231.

### 2. Stephen Chamberlin

"The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." Fed. R. Evid. 702 Committee Notes on Rules 2000 Amendments. "The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded." *Id.* Evidence based on "personal opinions and speculation rather than on a systematic assessment" of the facts at hand is "inherently unreliable" and therefore inadmissible. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 861 (9th Cir. 2014).

Defendants object to two aspects of Mr. Chamberlin's methodology: his use of a "working day rate" that utilizes the models' highest-paid job to estimate the value of their work, and his implementation of a "usage" multiplier which multiplies Plaintiffs' estimated damages by the use of an image in different usage categories, such as social media or print advertisements. Neither aspect of Mr. Chamberlin's testimony is inherently unreliable or speculative.

First, Mr. Chamberlin's report includes factors considered in calculating Plaintiffs'

- 6 -

day rates. His report asserts that "[a] day rate for Defendants' use in a hypothetical negotiation should at a minimum be equal to the value set by previous commercialization of the Model's image in combination with other factors that would influence the actual quoted or negotiated rate for a day's rate." (Doc 42-5 at 14.) These factors include the model's desirability (based on demand for her services, fame, and social media following), work history, and the effect of the product being advertised on a model's career *Id.* at 10-11. Although many of these measures are subjective, Mr. Chamberlin's report sufficiently alleges that they are derived from his skill and experience, which includes "30 years experience as a full-time professional within the Model and Talent industry." *Id.* at 4. Further, Defendant's assertion that the report uses only Plaintiffs' highest-paid jobs to calculate their rate is unsupported. Mr. Chamberlin's estimates clearly indicate that the rates are derived from consideration of the above factors as well as the range of rates each model has been paid in the past. *See, e.g.*, (Doc. 42-5 at 36, 47.) Whether he more heavily weighed the model's higher-paid positions or overestimated the increase in value for subjective considerations, such as damage to Plaintiffs' reputations, are questions of methodology to be addressed at trial. *Kennedy*, 161 F.3d at 1231. Because Mr. Chamberlin discloses his reasoning, and it is sufficiently grounded in verifiable facts and experience in the industry, Defendant's objections do not establish that the testimony is unreliable.

Second, Mr. Chamberlin's report also explains his use of the usage multiplier. Usage refers to the "way and method of use and distribution of images" such as branding, or social media. (Doc. 42-5 at 7.) Mr. Chamberlin's estimations apply multipliers to account for these different uses. Although Defendant asserts that the report "fails to explain how or why he uses this methodology," the portion of the report discussing usage identifies three categories of use—advertising, branding, and coupon/third party use—which Mr. Chamberlin asserts justify use of the multiplier. (Doc. 42 at 10-11); (Doc 42-5 at 12). The report also references an Association of Model Agents guide which states that the standard rates it discusses cover the right to publish once, and additional publication in other formats would include additional fees. (Doc. 42-5 at 129, 133.) Because Mr. Chamberlin explains

his reasoning for multiplying the estimation, it need not be excluded as unreliable. Defendants' qualms about the prevalence of such fees in the industry and Plaintiffs' previous contracts can be addressed on cross examination.

### 3. Martin Buncher

Defendants object to several features of Mr. Buncher's survey: the control group and control question; the nature of the questions and answer choices; the sample questioned; and whether the results are relevant to the legal issues before the Court.

#### a. Reliability

The Ninth Circuit has "long held that survey evidence should be admitted 'as long as [it is] conducted according to accepted principles and [is] relevant.'" *Fortune Dynamic, Inc.*, 618 F.3d at 1036 (quoting *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997)). "[T]echnical inadequacies in a survey, including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Fortune Dynamic, Inc.*, 618 F.3d at 1036 (internal quotations omitted); *see Wendt*, 125 F.3d at 814 ("Challenges to survey methodology go to the weight given the survey, not its admissibility.").

Plaintiffs have made an adequate preliminary showing that Mr. Buncher's survey was conducted with generally accepted survey principles. Mr. Buncher has 53 years of experience in the marketing research and marketing consulting field and has personally conducted over 500 secondary research projects. (Doc 43-2 at 29.) His report asserts that the "sample selection, questions, questionnaire design, and interviewing procedures were specifically designed with the generally accepted standards and procedures in the fielding of surveys set forth by the American Marketing Association." *Id.* at 7. It also explains the professional judgment and reasoning behind each feature of the survey. The sample was chosen to include respondents who had recently patronized similar clubs to ensure that the results reflected the population that was most likely to have seen the original, disputed advertisements; a control group was not employed given it was not a "causal" study; and the answer choices were crafted in accordance with recommendations in the field thought

to increase accuracy of responses. (Doc. 43 at 16–19.) Defendant disputes many of these features, which are addressed in more detail below, but its disagreement with Mr. Buncher's methodology does not overcome the fact that his report supports the structure of the survey with his experience and scholarly research of the field. Whether other, more reliable, methods existed goes to the weight that should be afforded to the survey.

### i.    Control Group and Control Question

The survey's lack of a control group or what defendant deems a proper control question do not prevent it from being properly admitted. Defendant offers no authority interpreting Ninth Circuit case law to suggest a survey lacking a control group is inadmissible, instead pointing to only a similar case in the Southern District of New York. *Edmondson v. RCI Hosp. Holdings, Inc.*, No. 16-CV-2242 (VEC), 2020 WL 1503452, at *7 (S.D.N.Y. Mar. 30, 2020). Although the *Edmonson* court cites to other New York cases suggesting a control group is a necessary survey feature, the Ninth Circuit has no comparable mandate. *See id.*; *Wendt*, 125 F.3d at 814. In fact, the Ninth Circuit has repeatedly held that technical flaws should not prevent a survey from being admitted. *Fortune Dynamic, Inc.*, 618 F.3d at 1036. And district courts in the Ninth Circuit applying the law do not mandate control groups. *Mattel, Inc. v. MCA Records*, Inc., 28 F. Supp. 2d 1120, 1135 (C.D. Cal. 1998), aff'd, 296 F.3d 894 (9th Cir. 2002) (finding lack of control group and leading questions were technical flaws which went to the weight of the survey); *BDO Remit (USA), Inc. v. Stichting BDO*, No. CV1104054MMMCWX, 2012 WL 12895658, at *10 (C.D. Cal. Sept. 19, 2012) (finding lack of control group was an issue the jury should consider when giving weight to the evidence).

Moreover, Mr. Buncher's report asserts a technical justification for the lack of control, explaining "[i]t would not have been possible to use a 'control group' as one could not make such measurements if the women were not part of the stimuli," and citing to a scholarly survey source to support his decision to implement a control question instead. (Doc. 43-2 at 11.) The fact that respondents may have been alerted to the variable being

tested by the survey's control question does not render it inadmissible. Courts do not demand that surveys be blind to be admissible. *See Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1110 (N.D. Cal. 2018) (holding that a "focalism bias objection goes to the weight, and not to the admissibility" of a survey); *Morales v. Kraft Foods Grp.*, No. LACV1404387JAKPJWX, 2017 WL 2598556, at *15–16 (C.D. Cal. June 9, 2017) (finding a failure to conduct a blind survey went to weight, rather than admissibility of the survey). Thus, the lack of control group and the structure of the control question do not render the survey inadmissible.

### ii. Improper Questions and Answers

The principle that allegations of technical unreliability are relevant to the weight, not the admissibility, of a survey also extends to objections concerning question format and content. In *E. & J. Gallo Winery v. Gallo Cattle Co.*, for example, the Ninth Circuit found admission of a survey despite claims that its "questions relating to confusion were slanted and that the interviewees' responses were coded improperly" was a "routine" example of defects relevant to weight, not admissibility. 967 F.2d 1280, 1292 (9th Cir. 1992); *see ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 613 (9th Cir. 2016) (finding that biased questions did not render a survey inadmissible). As such, courts frequently refuse to exclude survey evidence because of objections to question format or content. *See, e.g., Mattel*, 28 F. Supp. 2d at 1133 (finding a survey with "inherently leading or biased" questions admissible because its flaws were relevant to weight); *Icon Enters. Int'l, Inc. v. Am. Prod. Co.*, No. CV 04-1240 SVW PLAX, 2004 WL 5644805, at *27 (C.D. Cal. Oct. 7, 2004) (holding that confusing questions are the sort of technical flaw that goes to weight).

Defendant makes several challenges to the wording of individual questions and the available responses offered to survey participants. It claims the survey did not instruct respondents to guess or provide answers which expressed uncertainty; the questions were confusing or misleading; and undefined and expansive terms (such as "lifestyle," "events," "ads," and "all women") undermine the reliability of the responses. Defendant's

objections, however, do not render the survey results so unreliable that they must be excluded. Rather, these asserted inadequacies are more properly considered as part of the weight of the testimony given they concern the wording and structure of the survey. *See, e.g.*, *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, No. C 07-03752 JSW, 2008 WL 4614660, at *8 (N.D. Cal. Oct. 16, 2008) (finding assertions that a survey used leading questions went to weight because they were not unduly suggestive); *Meeker v. Meeker*, No. C 02-0741 JSW, 2004 WL 2457793, at *11 (N.D. Cal. July 6, 2004) (holding contention that the survey is irrelevant and confusing went to weight). Further, Mr. Buncher also explains that the questions were designed to elicit the true impressions of respondents, and answer choices were coded "yes/no," rather than including "no response" or "don't know" entries, because research in the field indicates such responses yield more accurate results. (Doc. 43-2 at 18.) Given the justification for this structure, and the body of law finding survey wording a matter of weight, these objections do not render the survey inadmissible.

### iii.   Group Sampled

The sampled group also does not render the survey inadmissible. Defendant cites no authority that suggests the absence of information about how survey respondents were recruited and communicated with prior to responding renders a survey inherently unreliable. In fact, such a conclusion contradicts the Ninth Circuit's application of the rule that technical defects are questions of weight. *See ThermoLife Int'l, LLC*, 648 F. App'x at 613 ("Although the district court faulted the survey's biased questions and unrepresentative sample, neither defect was so serious as to preclude the survey's admissibility."); *Fortune Dynamic, Inc.*, 618 F.3d at 1037 (holding that a district court abused its discretion excluding a survey because it failed to properly screen participants, and was "highly suggestive."). Defendant's claims that the communication with the respondents and gender makeup of the group render the survey unreliable are therefore unconvincing. *See also Meeker*, 2004 WL 2457793, at *11 (finding that an objection that "population surveyed was overly-inclusive" went to weight not admissibility); *His & Her Corp. v. Shake-N-Go Fashion Inc.*, No. 211CV05323CASVBKX, 2015 WL 13604255, at *3 (C.D. Cal. Apr. 6,

2015) (rejecting the contention that a survey should be excluded because of opponents contentions that its sample was both too broad and too narrow).

### b. Relevancy

Expert testimony is relevant if it "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (internal citations omitted). "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591–92.

Plaintiffs' suit includes claims for false light, appropriation, false association, and false advertising. The survey will provide evidence on whether the use of Plaintiff's photographs in Defendant's advertising implied their association or promotion of the Club. Such a determination is relevant to the claims given Plaintiffs' privacy claims assert that association with the Club would be offensive and their Lanham Act claims assert that a consumer would likely be confused by Defendant's advertising.

## II. Cross Motions for Summary Judgement

### A. Legal Standard

The purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex, 477 U.S. at 323*. Parties opposing summary judgment are required to "cit[e] to

1   particular parts of materials in the record" establishing a genuine dispute or "show[ ] that

2   the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P.

3   56(c)(1). A district court has no independent duty "to scour the record in search of a

4   genuine issue of triable fact[.]" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).

5   "[W]hen simultaneous cross-motions for summary judgment on the same claim are before

6   the court, the court must consider the appropriate evidentiary material identified and

7   submitted in support of both motions, and in opposition to both motions, before ruling on

8   each of them." *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132,

9   1134 (9th Cir. 2001).

10      **B. Arizona Claims**

11         **1.  Statutes of Limitations**

12      Arizona law determines the statute of limitations period and accrual date of state

13   law claims. The Plaintiffs assert two Arizona privacy claims: false light and the right of

14   publicity.

15      First, the parties agree that Arizona courts apply a one-year statute of limitations to

16   false light invasion of privacy actions. (Doc. 34 at 22); (Doc. 40 at 16); *see Watkins v.*

17   *Arpaio*, 239 Ariz. 168, 173, 367 P.3d 72, 77 (Ct. App. 2016) (applying a one-year statute

18   of limitations to a false-light invasion of privacy claim). State law also supports a finding

19   that the date of accrual in a false light claim is the date that the false information was

20   published. *See Watkins*, 239 Ariz. at 173, 367 P.3d at 77. [3]

21      Although Plaintiffs assert the continuing wrong doctrine tolls the statute of

22   limitations, they provide no Arizona authority suggesting the doctrine properly applies to

23   false light claims. Rather, for support, Plaintiffs cite only a federal case applying

24   Connecticut law. *Gibson v. Metropolis of CT LLC*, No. 19-CV-00544 (KAD), 2020 WL

25   956981, at *6 (D. Conn. Feb. 27, 2020). Yet the continuing wrong doctrine in Connecticut

26   ─────────────

27      [3]  *Watkins* is not binding authority because it was decided by the Arizona Court of
     Appeals not the Arizona Supreme Court. *In re Kirkland*, 915 F.2d 1236, 1239 (9th Cir.
28   1990). Nonetheless, "a federal court must predict how the highest state court would decide
     the issue using intermediate appellate court decisions, decisions from other jurisdictions,
     statutes, treatises, and restatements as guidance." *Id.*

is not analogous to Arizona law—it requires either a special relationship or a subsequent wrongful act in addition to a continuing wrong to properly apply. *Id.* Further, in *Watkins*, the Court of Appeals suggested such an application of the continuing wrong doctrine would be improper under Arizona law. *See id.* It held: "We are unaware of any authority compelling the conclusion that a false-light claim is subject to the 'continuing wrong' doctrine, and we decline Watkins's request to apply it here." *Id.*[4] The factual scenario presented in this case is analogous to the traditional false light claim addressed by *Watkins*. There, the Plaintiff alleged a public official falsely created a media "circus" by baselessly asserting the plaintiff was being investigated. *Watkins*, 239 Ariz. at 170, 367 P.3d at 74. The court declined to apply the continuing wrong doctrine because, although the investigation lasted over a year, the plaintiff did not allege "liability arose from a long series of cumulative acts, any one of which likely was insufficient by itself to support the claim." *Id.* at 172, 77.

Similarly, Defendants' social media advertising was not an ongoing wrong. Social media postings are posted once on a user's account. Although they remain accessible after initially shared, they prompt users to view them only when they are recent. After a brief period of time, only a user who goes looking through the past postings of a page can view them. Although it is conceivable that some types of online publications might constitute a continuing wrong, Plaintiffs do not argue this is the case and cite to no other authority suggesting Arizona law is properly extended. As this use is not sufficiently different from the Court of Appeals' guidance in *Watkins*, the Court declines to extend the continuing wrong doctrine here.[5] A one-year statute of limitations period which accrued on the date

---

[4] The only post-*Watkins* case cited by Plaintiffs is *Cruz v. City of Tucson*, 243 Ariz. 69, 74, 401 P.3d 1018, 1023 (Ct. App. 2017). *Cruz* affirms that the continuing wrong doctrine exists in Arizona but offers no insights about its application to false light claims. *Id.*

[5] As Plaintiffs do not raise the discovery rule in their briefing, the Court does not address it here. *See Thompson v. Pima Cty.*, 226 Ariz. 42, 46, 243 P.3d 1024, 1028 (Ct. App. 2010) ("[T]he relevant inquiry is when did a plaintiff's knowledge, understanding, and acceptance in the aggregate provide . . . sufficient facts to constitute a cause of action.") (internal quotation omitted).

of publication is therefore proper.

Second, Arizona has not yet established a statute of limitations period for the right of publicity. Traditionally, however, courts recognize four categories of privacy torts: intrusion on seclusion; public disclosure of private facts; false light; and right of publicity, also termed appropriation of name or likeness. *Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 338, 783 P.2d 781, 784 (1989) (recognizing the Restatement Second's "four-part classification of the tort"); Restatement (Second) of Torts, § 652A (1977). Each claim is often understood as one of four torts under the umbrella of privacy. *See, e.g.*, *Pinder, v. 4716 Inc.*, No. CV-18-02503-PHX-RCC, 2020 WL 6084052, at *8 (D. Ariz. Oct. 15, 2020). Absent a statute specifying the statutory period, it is therefore logical that each be treated the same. Although Plaintiffs correctly point out that no authority conclusively establishes which statutory period applies to right of publicity claims, they offer no authority or explanation for why the claim should be treated differently than other privacy torts. Thus, under *Watkins*, a one-year statute of limitations period applies.

The limitations period for Plaintiffs' Arizona Privacy claims thus began running on the date each image was posted. Given Plaintiffs' complaint was filed on March 8, 2019, their Arizona privacy claims for images posted before March 8, 2018 are time-barred. Plaintiffs Killings, Sampedro, Posada, Golden, Jones, and Gibson all allege claims for photos posted before March 8, 2018. Only Plaintiff Mitcheson alleges privacy claims for photos posted after March 8, 2018. (Doc. 1 at 14.) Defendant's Motion for Summary Judgment on Plaintiffs' Arizona privacy claims is thus granted as to Plaintiffs Killings, Sampedro, Posada, Golden, Jones, and Gibson.

### 2.  False Light

In Arizona, false light invasion of privacy claims are defined by the Second Restatement. *Godbehere*, 162 Ariz. at 342, 783 P.2d at 788 ("[W]e are persuaded to recognize the distinct tort of false light invasion of privacy as articulated by Restatement § 652E"). The Restatement provides:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
>
> > (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> >
> > (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

Restatement (Second) of Torts § 652E (1977). A plaintiff may thus recover, even in the absence of reputational damage, as long as the publicity is unreasonably offensive and attributes false characteristics. *Godbehere*, 162 Ariz. At 341, 783 P.2d at 787. "However, to qualify as a false light invasion of privacy, the publication must involve 'a major misrepresentation of [the plaintiff's] character, history, activities or beliefs,' not merely minor or unimportant inaccuracies." *Id.* (quoting Restatement (Second) of Torts § 652E (1977)).[6]

### a. Falsity

First, the fact that the photograph is an accurate depiction of Plaintiff Mitcheson at another photoshoot does not preclude a claim for false light. "A false light cause of action

---

[6] Defendant also contends that the false light claim is not available to Plaintiff Mitcheson because she claims to be a celebrity. The Arizona Supreme Court has held that "the right of privacy does not exist 'where the plaintiff has become a public character.'" *Godbehere*, 162 Ariz. at 343, 783 P.2d at 789 (quoting *Reed v. Real Detective Pub. Co.*, 63 Ariz. 294,304, 162 P.2d 133, 138 (1945)). Its discussion, however, actually led to a much narrower holding than Defendant asserts: "a plaintiff cannot sue for false light invasion of privacy if he or she is a public official and the publication relates to performance of his or her public life or duties." *Id. Godbehere* offers no insight into the rule's application to other types of notoriety, and Defendant provides no analysis or explanation for why Plaintiff is a public figure under Arizona law. Rather, it relies only on the fact that Plaintiff claims to be a celebrity in her briefing, a fact Defendant later vigorously contests. Given, the nebulous nature of the public figure inquiry—the Arizona Supreme Court has analogized the determination to "trying to nail a jellyfish to a wall"—Defendant has not met its burden of establishing Plaintiff is not entitled to the claim with only an underdeveloped an unsupported assertion that that is the case. *Dombey v. Phoenix Newspapers*, Inc., 150 Ariz. 476, 483, 724 P.2d 562, 569 (1986); *see also* Wright v. Old Gringo Inc., No. 17-CV-1996-BAS-NLS, 2018 WL 6788215, at *3 (S.D. Cal. Dec. 26, 2018) ("[M]erely making a conclusory argumentative statement without citation to law or analysis is insufficient either to competently raise the argument for judicial consideration or for a party to meet its burden on summary judgment.")

can arise where a publication of true fact creates a false impression about the plaintiff." *Id.* Plaintiff asserts that the use of the photo to promote Defendant's Club, not the fact that the photo depicts her inaccurately, is what places her in a false light. Therefore, this is an allegation that a true publication creates a false impression about Plaintiff's relationship with Defendant, a claim that falls squarely within *Godbehere*'s definition of false light invasion of privacy.

### b. Highly Offensive to a Reasonable Person

Second, there is a genuine dispute as to whether publication in Defendant's advertisements would be highly offensive to a reasonable person. Defendant alleges its advertising could not be highly offensive to reasonable person because (1) it is a nightclub, and "there is simply nothing offensive about a nightclub," and (2) Plaintiffs agreed to pose in risqué clothing for the original advertisements which were posted online, and the photographs have not been altered. Neither argument demonstrates as a matter of law that a reasonable person could not have been highly offended by the depiction.

Defendant's briefing refers to itself as a "gentlemen's club" not merely a nightclub, and its advertisements depict the Plaintiffs wearing risqué clothes and lingerie with taglines such as "Playhouse Tuesdays," and "Pajama Party." (Doc. 34 at 3, 7, 15.) A reasonable jury could find association with such advertising highly offensive to a reasonable person.

Defendant likewise conflates consent to take a photograph for a discreet advertisement with consent that the photograph be depicted connected to another, unrelated institution. In *Godbehere*, the Arizona Supreme Court detailed an instructive case from the Seventh Circuit:

> In *Douglass*, the plaintiff posed nude, consenting to the publication of her photographs in Playboy magazine. Her photographer subsequently left the employ of Playboy for Hustler magazine, a publication of much lower standing in the journalistic community. He sold her photographs to Hustler, which published them. The plaintiff sued for the nonconsensual use of the photographs. Plaintiff had no cause of action for defamation, because essentially, there was nothing untrue about the photographs. She posed for them and, as published, they did not misrepresent her. She also had no claim for outrage. She voluntarily posed for the photographs and consented to their

> publication in Playboy. . . . However, the court upheld her recovery for false
> light invasion of privacy. The jury may have focused on the differences
> between Playboy and Hustler and concluded that to be published in Hustler,
> as if she had posed for that publication, falsely placed her in a different light
> than the Playboy publication. 769 F.2d at 1138.

162 Ariz. at 341 n.2, 783 P.2d at 787 (citing *Douglass v. Hustler Magazine*, Inc., 769 F.2d
1128 (7th Cir.1985)). Here, it is undisputed that the Plaintiff did not consent to the use of
her image, and Defendant knew it had not sought or received permission for the
publication. (Doc 33 at 7); (Doc. 33-10 at 6). As in *Douglass*, although Plaintiff Mitcheson
voluntarily posed for the photograph, a reasonable jury could conclude that association
with the Defendant's Club placed her in a different light than the original publication of
the image. [7] The Court thus cannot conclude as a matter of law that association with
Defendants could not be highly offensive to a reasonable person.

### c.  Knowledge or Reckless Disregard for Falsity

Third, there is a genuine dispute as to whether Defendant acted with knowledge or
reckless disregard as to the falsity of the publicized matter. It is undisputed that Defendant
knew it did not have permission from Plaintiff Mitcheson to use her images, had a policy
requiring employees to give permission to use their image in advertisements, and intended
to attract customers and represent that the Plaintiff endorsed or was affiliated with the Club
by using of her image. (Doc 33 at 7); (Doc. 33-10 at 6). It is also undisputed that Plaintiff
has never been employed or compensated by Defendant. *Id.* These facts could give rise to

---

[7] The Restatement's illustrations further affirm that such a determination must be
reserved for the factfinder. Illustration nine explains:

> A is the pilot of an airplane flying across the Pacific. The plane develops motor
> trouble, and A succeeds in landing it after harrowing hours in the air. B Company
> broadcasts over television a dramatization of the flight, which enacts it in most
> respects in an accurate manner. Included in the broadcast, however, are scenes,
> known to B to be false, in which an actor representing A is shown as praying,
> reassuring passengers, and otherwise conducting himself in a fictitious manner that
> does not defame him or in any way reflect upon him. Whether this is an invasion of
> A's privacy depends upon whether it is found by the jury that the scenes would be
> highly objectionable to a reasonable man in A's position.

Restatement (Second) of Torts § 652E (1977). Likewise, here, there is evidence that
Defendant knew its publications associated Plaintiff with the Club. (Doc. 33-10 at 6); (Doc
34 at 21). Whether such a false statement is offensive is a question for the jury.

a reasonable inference that Defendant knew it was publishing false information by implying Plaintiff's association with the Club. *See Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1085 (9th Cir. 2002) ("The subjective determination of whether [the defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts.") (alteration in original). Such an inference does not, however, establish as a matter of law that Plaintiff is entitled to judgment; a factfinder could reasonably reject an inference of knowledge from the above facts.

Further, Defendant's assertion that it did not act knowingly or recklessly because it merely reproduced a "publicly available" photograph does not invalidate Plaintiff's claim. (Doc 34 at 21.) Defendant knew it did not have permission from Plaintiff to publish her image and that it was implying a relationship which did not exist. (Doc. 33-10 at 6); (Doc 34 at 21). A jury could reasonably find that those facts overcome Defendant's assertion that it thought the photos were "public." There are therefore facts which create a triable issue as to whether Defendant acted with knowledge or with reckless disregard to the falsity of the statement.

### 3.  Right of Publicity

#### a.  Arizona's Recognition of the Claim

Defendant's primary argument is that Arizona does not recognize a common law right of publicity. This is not the case. The Arizona Court of Appeals explicitly recognized the claim in *In re Estate of Reynolds*, 235 Ariz. 80, 81, 327 P.3d 213, 214 (Ct. App. 2014). *See also Geiger v. Creative Impact Inc.*, No. CV-18-01443-PHX-JAT, 2020 WL 3545560, at *7 (D. Ariz. June 30, 2020) (holding *Reynolds* recognizes a right to publicity); *Skinner v. Tuscan Inc.*, No. CV-18-00319-TUC-RCC, 2020 WL 5946898, at *6 (D. Ariz. Oct. 7, 2020) (same). Nor was *Reynolds* dicta as Defendant asserts. The court clearly stated "[w]e hold that a right of publicity exists under Arizona law," and the opinion's ultimate decision that the plaintiff had not established the elements of the claim relied on that determination. *Reynolds*, 235 Ariz. at 81, 327 P.3d at 214; *see Phelps Dodge Corp. v. Ariz. Dep't of Water*

1    *Res.*, 211 Ariz. 146, 152 n.9, 118 P.3d 1110, 1116 n.9 (Ct. App. 2005) (defining obiter

2    dictum as "[a] judicial comment made during the course of delivering a judicial opinion,

3    but one that is unnecessary to the decision in the case and therefore not precedential")

4    (internal citation omitted).

5         The fact that the Arizona legislature established a cause of action for unwanted

6    publicity for soldiers under Arizona Revised Statute § 12-761(B) also does not forestall the

7    state's recognition of a broader common law right. A.R.S. § 12-761(B) ("A person is liable

8    for using the name, portrait or picture of any soldier without having obtained prior

9    consent."). In Arizona, "if the common law is to be changed or abrogated by statute, the

10   legislature must do so expressly or by necessary implication." *Pleak v. Entrada Prop.*

11   *Owners' Ass'n*, 207 Ariz. 418, 422, 87 P.3d 831, 835 (2004). No such abrogation occurred.

12   In fact, the statute was passed in, and recognized, a common law setting that contemplated

13   a broader common law right of privacy.  *Reynolds* recognized the claim after the statute

14   became law. Ariz. Rev. Stat. Ann. § 12-761 ("The rights and remedies provided in this

15   section supplement any other rights and remedies provided by law, including the common

16   law right of privacy.") Absent express action from the legislature, *Reynolds* remains good

17   law.[8]

18                                 **b.  Prima Facie Case**

19        Under Arizona law, "'[o]ne who appropriates the commercial value of a person's

20   identity by using without consent the person's name, likeness, or other indicia of identity

21   for purposes of trade is subject to liability' for resulting damages." *Reynolds*, 235 Ariz. at

22   82, 327 P.3d at 215; Restatement (Third) of Unfair Competition § 46 (1995). "Although

23   proof of deception or confusion is not an element . . . the right of publicity indirectly affords

24   _____

25        [8] Defendant's selective quotation of the Senate Committee does not prove
     otherwise. The statute was proposed in an effort to ensure that deceased solders' families
26   would have a cause of action if the name or likeness of their loved one was used to for
     commercial gain after their death. The context of the law establishes no intent on the part
27   of the legislature to prevent a broader cause of action. *See* Minutes of Senate Committee
     on   Commerce   and   Economic   Development,   1/10/2007,   at   p.3
28   https://www.azleg.gov/legtext/48leg/1R/comm_min/Senate/011007%20CED.pdf   (last
     visited 10/09/2020).

protection against false suggestions of endorsement or sponsorship." *Id.*

As Arizona common law defers to the Restatement unless directed otherwise, the Third Restatement is instructive. *See Espinoza v. Schulenburg*, 212 Ariz. 215, 217, 129 P.3d 937, 939 (2006) ("[A]bsent law to the contrary, Arizona courts follow the Restatement."); *Reynolds*, 235 Ariz. at 82, 327 P.3d at 215 (applying the Third Restatement). To establish appropriation, the use must "be sufficient to identify the person whose identity the defendant is alleged to have appropriated." Restatement (Third) of Unfair Competition § 46 cmt. d (1995). Specifically,

> [i]n the case of an alleged visual likeness, the plaintiff must be reasonably identifiable from the photograph or other depiction. Whether the plaintiff is identified by the defendant's use is a question of fact. Relevant evidence includes the nature and extent of the identifying characteristics used by the defendant, the defendant's intent, the fame of the plaintiff, evidence of actual identification made by third persons, and surveys or other evidence indicating the perceptions of the audience.

*Id.* Although, "most often invoked to protect the value associated with the identity of a celebrity . . . the identity of even an unknown person may possess commercial value." *Id.* Fame is therefore most "relevant to the determination of appropriate relief." *Id.*

Plaintiff Mitcheson argues that undisputed facts establish her claim. She alleges (1) "Defendant used each Plaintiff's identity in their advertisements;" (2) Defendant sought and obtained a commercial advantage by using her identity "by, at minimum, getting Plaintiff[] to appear for free in these advertisements;" (3) she has never "been employed by, contracted with or has otherwise given permission or consent to Defendant to use her Image to advertise, promote, market or endorse Antro;" and (4) that she was "injured by, at minimum, being denied the fair market revenue she would have received but for Defendant's misappropriations." (Doc. 32 at 5.)

Rather, than contest any of these elements, Defendant has limited its arguments to the existence of the cause of action in Arizona. Thus, Plaintiff Mitcheson is entitled to summary judgment on this claim given Defendant has identified no facts which support a finding that a genuine issue of fact remains, and the undisputed facts are sufficient to

establish every element of the Plaintiff's right of publicity claim. Although Plaintiff has sufficiently alleged that her damages are at least the fair market value of her work, because her briefing suggests that she also asserts additional damages, her motion for summary judgement is granted only as to the issue of liability for violation of her right of publicity and the quantity of damages remains a question of fact.

## C.  The Lanham Act

There are two distinct bases of liability under § 1125 of the Lanham Act: false association, § 1125(a)(1)(A), and false advertising, § 1125(a)(1)(B). 15 U.S.C. § 1125(a); *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). The Act provides:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1). Defendant asserts that Plaintiffs raised only a "false endorsement" claim, rather than false association and false advertising. But Count II of Plaintiffs' complaint alleges "Violation of the Lanham Act, 15 U.S.C. § 1125(a)," which encompasses both sections. (Doc. 1 at 16.) Given courts recognize two distinct actions under § 1125(a), and the complaint's factual allegations correspond to both claims, Plaintiffs adequately asserted both claims.

### a.  False Association

Under § 1125(a)(1)(A), "[a] false endorsement claim based on the unauthorized use of a celebrity's identity . . . alleges the misuse of a trademark, i.e., a symbol or device such

as a visual likeness, vocal imitation, or other uniquely distinguishing characteristic, which is likely to confuse consumers as to the plaintiff's sponsorship or approval of the product." *Wendt*, 125 F.3d at 812 (quoting *Waits v. Frito-Lay, Inc.*, 978 F.2d 1093, 1110 (9th Cir. 1992)). The Ninth Circuit has "identified eight factors—called the *Sleekcraft* factors—for determining whether a defendant's use of a mark is likely to cause consumer confusion: (1) the strength of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) the likelihood of expansion of the product lines." *Gordon v. Drape Creative, Inc.*, 909 F.3d 257, 264 n.6 (9th Cir. 2018); *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979). This "eight-factor test is a 'pliant' one, in which 'some factors are much more important than others.'" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (quoting *Brookfield Comm., Inc. v. W. Coast Ent. Corp.*, 174 F.3d 1036, 1054 (9th Cir. 1999)). Where, as here, the content is web-based, "the three most important *Sleekcraft* factors are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel." *Id.* (internal quotations omitted). "Given the open-ended nature of this multi-prong inquiry . . . summary judgment on 'likelihood of confusion' grounds is generally disfavored." *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1210 (9th Cir. 2012).

### i.   Strength of Plaintiffs' Marks

"In cases involving confusion over endorsement by a celebrity plaintiff, 'mark' means the celebrity's persona. The 'strength' of the mark refers to the level of recognition the celebrity enjoys among members of society." *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1400 (9th Cir. 1992) (internal citation omitted). Specifically, the level of recognition amongst the defendant's intended audience. *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1007 (9th Cir. 2001).

The strength of each Plaintiff's mark is a triable issue of fact. Each Plaintiff works as a professional model, and their respective social media followings span from

approximately 60,000 followers and viewers to over 2,000,000. (Doc. 1 at 3–5.) Defendant's ads were posted on social media, so the relevant audience would include the social media users to whom Defendant intended to advertise. And Plaintiffs assert through the Buncher Survey that they were recognized by 13–21% of survey respondents in an online poll targeting likely attendees of clubs like the Defendant's. (Doc. 43-2 at 21.) A jury could reasonably conclude that, given each Plaintiffs' following and recognition rate, they are sufficiently well-known to claim false association; or it could conclude that given over 80% of respondents did not recognize the Plaintiffs they are too obscure to bring the claim. As discussed above, Defendant's objections to the methodology that generated this recognition rate, are issues for the jury to consider when weighing the evidence. *See Fortune Dynamic, Inc.*, 618 F.3d at 1036.

### ii.      Relatedness of the Goods

"In cases concerning confusion over celebrity endorsement, the plaintiff's 'goods' concern the reasons for or source of the plaintiff's fame." *White*, 971 F.2d at 1400 (finding Vanna White's fame related to VCR's because she is known for televised performances). Courts thus consider "the relatedness of the fame or success of the plaintiff to the defendant's product." *Downing*, 265 F.3d at 1007.

The parties disagree over the nature of the product at issue. Defendants claim its product is its business as a gentlemen's club. (Doc. 34 at 15.) Plaintiffs' claim that both parties are "vying for the same dollar" given they are both competing for the attention of the public using the images of beautiful women. (Doc. 40 at 10.) Regardless of how each party frames the issue, the nature of the Defendant's advertising and at least a portion of the Plaintiffs' modeling work demonstrate that both parties market female sexuality. A reasonable jury could find that Defendant chose Plaintiffs' photos because of this overlap in emphasis. The Buncher survey suggests that 94% of respondents thought it "somewhat likely" or "very likely" that the "women shown in the ads . . . represent the same kind of women [they] would expect to see performing in some way at the Club represented." (Doc. 43-2 at 25.)

###### iii.    Similarity of the Marks

In celebrity cases, the similarity of the marks is an analysis of "the similarity of the likeness used by the defendant to the actual plaintiff." *Downing*, 265 F.3d at 1008. This factor favors the Plaintiffs because Defendant used actual photos of the Plaintiffs in its advertisements. *See Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1069 (9th Cir. 2015) ("No one disputes the third factor: A.V.E.L.A. used actual photos of Marley on its merchandise."); *Downing*, 265 F.3d at 1008 ("Applying the third factor, the similarity of the likeness, to the Appellants is clear because it is an actual photograph of the Appellants with their names designated.").

###### iv.    Evidence of Actual Confusion

"Evidence of actual confusion is relevant to likelihood of confusion but not required in a false endorsement claim." *Fifty-Six Hope Rd. Music*, 778 F.3d at 1070. However, "if a party produces evidence from which a reasonable jury could surmise that an '*appreciable number*' of people are confused about the source of the product, then it is entitled to a trial on the likelihood of confusion—although it will not necessarily prevail at that trial." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) (quoting *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1151 (9th Cir. 2002)).

Actual confusion is a triable issue of fact. Plaintiffs present the Buncher survey, which indicates that 89% of respondents thought that the Plaintiffs "approve the use of their image in those Club advertisements in which they appear," 85% of respondents thought that the Plaintiffs in the "ads have agreed to sponsor, endorse or promote the club," and 69% of respondents thought that the Plaintiffs in the ads had "some affiliation, connection or association with those Clubs in whose ads they appear." (Doc. 43-2 at 25.) This evidence contradicts Defendant's assertion that "Plaintiffs have not provided a single piece of evidence establishing actual confusion," and creates a triable issue of fact (Doc. 34 a6 16); *Thane Int'l, Inc.*, 305 F.3d at 902 ("Survey evidence may establish actual confusion."). Further, as discussed above, Defendant's criticism of Mr. Buncher's methodology does not preclude the evidence or establish it is entitled to judgment as a

matter of law. Rather, these questions about the accuracy of the survey demonstrate that a factfinder must determine how much weight to afford the survey evidence. *See Fortune Dynamic, Inc.*, 618 F.3d at 1036.

### v.    Marketing Channels Used

"Convergent marketing channels increase the likelihood of confusion." *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1151 (9th Cir. 2011) (quoting *Sleekcraft*, 599 F.2d at 353). This factor is less informative, however, when a marketing channel is in widespread use, such as internet advertising. *See id.* When considering internet use, "[t]he proper inquiries are whether both parties use the Web as a substantial marketing and advertising channel, whether the parties' marks are utilized in conjunction with Web-based products, and whether the parties' marketing channels overlap in any other way." *Entrepreneur Media*, 279 F.3d at 1151 (internal citations and quotations omitted).

Both parties use social media platforms to market their products. The Plaintiffs' products are also often solely web-based, as their modeling and endorsement work may be published online or through social media. *See, e.g.*, (Doc 42-5 at 36) (describing Plaintiff Mitcheson's work). Although such promotion is narrower than all internet marketing, it is still a sufficiently pervasive form of advertising that it sheds little light on the overall analysis, only slightly favoring Plaintiffs. *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir. 2004) (finding the factor "equivocal" where both parties marketed through the internet because of the "broad use" of the channel).

### vi.    Likely Degree of Purchaser Care

The likely degree of purchaser care presents a triable issue of fact. Plaintiffs suggest that nightclub attendance is relatively inexpensive, so a high degree of care is unlikely, while Defendant suggests that nightclub attendees are highly selective about where they spend their time. (Doc. 32 at 15-16); (Doc. 34 at 17). Because neither party presents evidence to support their assertion, neither supports their position that they are entitled to judgment as a matter of law. Rather, these conflicting opinions and the lack of other

evidence suggest that a jury must determine the likely degree of customer care. *See Fortune Dynamic*, 618 F.3d at 1038 ("the difficulty of trying to determine with any degree of confidence the level of sophistication of young women shopping at Victoria's Secret only confirms the need for this case to be heard by a jury"); *Playboy Enterprises*, 354 F.3d at 1028 (finding that the "adult-oriented and graphic nature" of the materials as well as their online delivery suggested that a consumer might not use a high degree of care).

### vii.    Defendant's Intent in Selecting the Mark

"As a general rule, the plaintiff in an action for trademark infringement is not required to prove the defendant's intent. However, where such intent has been shown, the 'inference of likelihood of confusion is readily drawn.'" *HMH Pub. Co. v. Brincat*, 504 F.2d 713, 720 (9th Cir. 1974) (explaining that "the alleged infringer has indicated by his actions an expectation that such confusion will indeed be created."). Proof of intent to cause confusion, therefore, effectively shifts the burden to the defendant to establish that the effort has proven unsuccessful. *Id.* In *Downing*, for example, the Ninth Circuit found that because the defendant's used famous surfers' photos when advertising its clothing line "a reasonable jury could find that [defendant] intended to indicate to consumers that these legendary surfers were endorsing [their] merchandise." 265 F.3d at 1008.

Here, like *Downing*, Defendant used photographs of Plaintiffs to promote its Club. A reasonable jury could conclude that Defendant intended to indicate to consumers that the Plaintiffs endorsed the nightclub. Defendants, in contrast, assert that the Plaintiffs were not chosen to suggest that "these particular" women endorsed its Club, but merely because the "photographs depicted beautiful women in risqué photoshoots." (Doc. 34 at 17.) Although a reasonable jury could draw inferences from the use of Plaintiffs' images, Defendant is correct that use of the photographs alone does not conclusively establish intent. There remains a triable issue of fact on this factor.

### viii.    Likelihood of Expansion of the Product Lines

Plaintiffs are professional models and public figures and Defendant operates a nightclub. They present no evidence that they will compete with one another in the future.

1    Thus, like most celebrity endorsement claims, this factor in inapplicable. *See White*, 971

2    F.2d at 1401.

3                                   **ix.    Conclusion**

4            As described above, there are disputes of material fact about the strength of the

5    mark, the proximity of the goods, evidence of actual confusion, the degree of care likely to

6    be exercised by the purchaser, and the Defendant's intent in selecting the mark. Thus, there

7    is a genuine dispute of material fact as to likelihood of confusion and neither party is

8    entitled to summary judgment on the issue.

9                              **b.   False Advertising**

10           In *Lexmark International*, the Supreme Court established a two-part test to

11   determine whether a plaintiff can bring a false advertising claim under the Lanham Act.

12   572 U.S. at 131–32. Courts must consider (1) whether the plaintiff's claim falls "within the

13   zone of interests protected by the law invoked;" and (2) whether the plaintiff's injuries

14   were "proximately caused by violations of the statute." *Id.* at 129, 132. Plaintiffs do not

15   establish either element, so the Court need not reach the merits of their False Advertising

16   claim.

17                              **i.   Zone of Interest**

18           First, "to come within the zone of interests in a suit for false advertising under

19   § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales."

20   *Id.* at 131–132. The Court derived this rule from the purpose of the act, explaining "a

21   typical false-advertising case will implicate only the Act's goal of "protect[ing] persons

22   engaged in [commerce within the control of Congress] against unfair competition." *Id.* at

23   131 (quoting 15 U.S.C. § 1127) (alternation in original).

24           In establishing the zone of interest analysis, the Court explicitly rejected bright line

25   competition rules like the "direct-competitor test." *Id.* at 136. It is a mistake, it explained,

26   "to infer that because the Lanham Act treats false advertising as a form of unfair

27   competition, it can protect only the false-advertiser's direct competitors." *Id.* Plaintiffs

28   suggest that this holding leads to the much broader conclusion that any requirement of

competitive injury has been abrogated. (Doc. 48 at 5.) Although there is tension between *Lexmark* and the Ninth Circuit's prior holdings that a plaintiff must demonstrate that their "injury is 'competitive' or harmful to the plaintiff's ability to compete with the defendant," the analyses are not mutually exclusive. *Jack Russell Terrier Network of N. Ca. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1037 (9th Cir. 2005). Rather, requiring a lesser showing of competition, such as proof that the alleged false advertising harmed the plaintiff's ability to compete in the marketplace, is consistent with both bodies of law. *See Lexmark*, 572 U.S. at 137 (reasoning that the zone of interest test was satisfied because the plaintiff's "position in the marketplace has been damaged by [defendant]'s false advertising.") Such an interpretation is also consistent with the definition of a false advertising claim, which punishes "commercial injuries from false advertising [that] are derivative of those suffered by consumers who are deceived by the advertising." *Lexmark*, 572 U.S. at 133.

District courts applying *Lexmark* affirm this understanding that false advertising must allege a harm related to the plaintiff's success in the market, not just between the parties. *See, e.g.*, *Spice Jazz LLC v. Youngevity Int'l, Inc.*, No. 19-CV-583-BAS-WVG, 2020 WL 3402250, at *3 (S.D. Cal. June 19, 2020) ("A broad allegation that the two "competed" for customers is insufficient" to establish standing); *ThermoLife Int'l LLC v. Am. Fitness Wholesalers LLC*, No. CV-18-04189-PHX-JAT, 2020 WL 122874, at *3 (D. Ariz. Jan. 10, 2020). Indeed, district courts have a duty to reconcile Ninth Circuit precedent requiring competition with Supreme Court Authority. *Fed. Trade Comm'n v. Consumer Def.*, LLC, 926 F.3d 1208, 1213 (9th Cir. 2019) ("[I]f we can apply our precedent consistently with that of the higher authority, we must do so.").

Here, Plaintiffs do not state a false advertising claim because they have not established that they are competitive with Defendant in any market. Defendant is a nightclub. Plaintiffs are actresses and models. Plaintiff suggests no common marketplace where the Plaintiffs will be competing with a nightclub for business and it is not the job of this Court to imagine the possibilities for such competition. Rather, Plaintiffs assert that their injury to a commercial interest in reputation or sales is that they were not paid for

1    Defendant's use of their images. (Doc. 48 at 5). This assertion misunderstands the nature

2    of a false advertising claim, which is focused on how false assertions in the market harm a

3    plaintiff's present and future prospects. Alleging entitlement to payment for the false claim

4    is therefore insufficient to prove that the Plaintiffs' are within the zone of interest of the

5    Act.

6                                  **ii.  Proximate Cause**

7            Second, to establish proximate cause, "a plaintiff suing under § 1125(a) ordinarily

8    must show economic or reputational injury flowing directly from the deception wrought

9    by the defendant's advertising; and that that occurs when deception of consumers causes

10   them to withhold trade from the plaintiff." *Lexmark*, 572 U.S. at 133. Here too, the nature

11   of the injury and its connection to the marketplace is relevant. *Id.* at 136 ("a plaintiff who

12   does not compete with the defendant will often have a harder time establishing proximate

13   causation."). Paradigmatic false advertising claims involve direct injury, where "one

14   competito[r] directly injur[es] another by making false statements about his own goods [or

15   the competitor's goods] and thus inducing customers to switch." *Id.* at 137 (alternation in

16   original). An indirect injury, however, is also sufficient to establish proximate cause where

17   there is a clear link between the direct victim and the injury to the indirect victim. *Id.* at

18   139. In *Lexmark*, for example, the parties were not direct competitors; the plaintiff

19   produced microchips which were only used for refurbishing the defendant's printer

20   cartridges and sold them to third parties. *Id.* at 121, 138. The defendant made false

21   statements to these third-party remanufacturers and its customers that refurbishing its

22   cartridges was illegal. *Id.* at 122. Although this false statement concerned a third party, the

23   plaintiff's allegation of proximate cause was sufficient because there was a near "1:1"

24   relationship between the number of cartridges sold by the third-party remanufacturers and

25   the number of chips sold by the plaintiff. *Id.* at 139.

26           The Plaintiffs' alleged harms are not analogous. Again, their claimed damages are

27   the value of payment for use of their photographs. They allege no damage in relation to the

28   affect of the Defendant's advertising on the demand for or value of their services. Without

any allegation that Defendant's actions proximately caused harm to their business with other consumers, they have not alleged facts sufficient to support a False Advertising claim.

### D.  Collateral Estoppel

"Defensive collateral estoppel applies when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." *Masson v. New Yorker Magazine*, 85 F.3d 1394, 1400 (9th Cir. 1996) (internal quotation omitted). "The party asserting preclusion bears the burden of showing with clarity and certainty what was determined by the prior judgment." *Clark v. Bear Stearns & Co.*, 966 F.2d 1318, 1321 (9th Cir. 1992). "It is not enough that the party introduce the decision of the prior court; rather, the party must introduce a sufficient record of the prior proceeding to enable the trial court to pinpoint the exact issues previously litigated." *Id.*

Defendant asserts that Plaintiffs Posada and Golden, should be precluded from litigating their Lanham Act claims, and Plaintiff Gibson should be precluded from litigating her Lanham Act claims as well as her state tort claims because two Southern District of New York cases, *Toth* and *Gibson*, and one Maricopa County case, *Canas*, have already addressed similar issues. Apart from asserting that these cases involve common plaintiffs and "identical" claims, Defendant makes no showing that the factual circumstances in the cases are the same and warrant the application of collateral estoppel. The bare allegation that the same legal issues have been previously addressed is insufficient.

## CONCLUSION

As described above, each expert will be permitted to testify to their expert opinions at trial. Defendant's Motion for Summary Judgment is granted as to the Plaintiffs' Arizona law claims outside the applicable one-year statute of limitations, and the Lanham Act false advertising claims. Plaintiffs' Motion for Summary Judgment is granted as to Plaintiff Mitcheson's Right of Publicity claim. A genuine issue of material fact exists for the remaining claims.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Strike the Report and Testimony of Martin Buncher (Doc. 43) is **DENIED.**

1    **IT IS FURTHER ORDERED** that Defendant's Motion to Strike the Report and

2    Testimony of Stephen Chamberlin (Doc. 42) is **DENIED.**

3    **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Strike the Report and

4    Testimony of Michael Einhorn (Doc. 31) is **DENIED.**

5    **IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment

6    (Doc. 34) is **GRANTED IN PART AND DENIED IN PART.** The Motion for Summary

7    Judgment (Doc. 34) is granted as to Plaintiffs' claims for false advertising under the

8    Lanham Act as well as the claims for false light invasion of privacy and right of publicity

9    brought by Plaintiffs Killings, Sampedro, Posada, Golden, Jones, and Gibson.

10   **IT IS FURTHER ORDERED** that Plaintiffs' Motion for Summary Judgment

11   (Doc. 32) is **GRANTED IN PART AND DENIED IN PART.** The Motion for Summary

12   Judgment (Doc. 32) is granted as to the issue of liability in the right of publicity claim

13   brought by Plaintiff Mitcheson.

14   Dated this 2nd day of December, 2020.

15

16

17   G. Murray Snow
     Chief United States District Judge

18

19

20

21

22

23

24

25

26

27

28